# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

### DECEMBER SESSION, 1998

FILED

May 11, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **GREG L. BAINE,** | ) | **C.C.A. NO. 03C01-9806-CR-00201** |
| | ) | |
| Appellant, | ) | |
| | ) | |
| | ) | **POLK COUNTY** |
| **VS.** | ) | |
| | ) | **HON. CARROLL L. ROSS** |
| **STATE OF TENNESSEE,** | ) | **JUDGE** |
| | ) | |
| Appellee. | ) | **(Post-Conviction)** |

FOR THE APPELLANT:

LEONARD M. CAPUTO
Phillips & Caputo
312 Vine Street
Chattanooga, TN 37403

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

R. STEPHEN JOBE
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243

JERRY N. ESTES
District Attorney General

SHARI TAYLOE
10th Judicial District
P. O. Box 1351
Cleveland, TN 37364-1351

OPINION FILED _____

AFFIRMED

JERRY L. SMITH, JUDGE

# **OPINION**

The petitioner, Greg L. Baine, appeals the Polk County Criminal Court's order denying his petition for post-conviction relief after an evidentiary hearing. Petitioner was convicted in 1991 of one (1) count of premeditated first degree murder and sentenced to life imprisonment. He filed a post-conviction petition, alleging, *inter alia*, ineffective assistance of counsel. On appeal, petitioner claims that trial counsel was ineffective for failing to "properly utilize exculpatory discovery material" and for failing to speak with state officials before they conducted an uncounseled interview with the petitioner. After a thorough review of the record before this Court, we affirm the judgment of the trial court.

## I.

### A. Trial

Petitioner was convicted after a jury trial of premeditated first degree murder and was sentenced to life imprisonment. His conviction was affirmed by this Court. <u>State v. Greg Baine</u>, C.C.A. No. 03C01-9202-CR-43, 1992 WL 151403, Polk County (Tenn. Crim. App. filed July 2, 1992, at Knoxville), *perm. to app. denied* (Tenn. November 30, 1992). We will recite the facts as set out by this Court on direct appeal:

> On December 24, 1990, at 8:45 p.m., the body of Ronnie Laudermilk was found at the Crestview Cemetery in Polk County. It is undisputed that the appellant killed Mr. Laudermilk. His defense at trial was that of self-defense.
>
> Although the appellant referred to the decedent as a longtime friend, the appellant was having an affair with the decedent's wife. The decedent had apparently learned about the affair and had confronted the appellant during the day he was killed. The appellant testified at trial that during this initial confrontation, the decedent put

a gun to the appellant's chest and threatened his life. No physical violence resulted from this meeting. Later that day the decedent and appellant met each other in town. The decedent allegedly told the appellant that he wished to speak with him, but he desired to do so out of town. They began driving, the appellant leading the decedent, with no apparent destination. After driving approximately fifteen miles, they approached Crestview Cemetery. The decedent blew his horn and pointed to the cemetery, indicating his desire to stop at the cemetery. The appellant testified that after he stopped, the decedent pulled in behind him attempting to block his car from exiting. The decedent exited the car and threw a beer at the appellant's windshield. After leaving his truck, the decedent allegedly kicked the appellant's car door shut and would not let him out of the car. According to the appellant's testimony the decedent then stated, "I'm gonna get my shotgun out of the truck," and "I've got you right where I want you now." The appellant had a shotgun in his car and made certain that the decedent saw it. According to the appellant, the decedent then turned and walked to his truck to get his shotgun. The appellant testified that he shot the decedent when the decedent turned away and started toward the truck.

The appellant stated that he could not see the decedent after the shot was fired because it was dark. He exited his car on the passenger's side, walked around to the front of the car, and saw Mr. Laudermilk on his hands and knees. The appellant stated at trial that he saw Laudermilk reaching into his pocket with his right hand. The appellant supposedly was aware that the decedent habitually carried a pistol. He twice ordered Laudermilk to stop reaching into his pocket, but he paid no attention. Therefore, appellant shot the decedent a second time with his 12-gauge shotgun. Laudermilk died in the cemetery before being found by a passerby.

State v. Greg Baine, 1992 WL 151403 at *1.

## B. Post-Conviction Hearing

The petitioner was twenty-nine (29) years old at the time of the post-conviction hearing. He stated that he was twenty-one (21) years old when the shooting occurred and had an eleventh grade education.[1] Although both were married to other people, he and Michelle Loudermilk[2] became romantically

---

[1] However, the petitioner testified at trial that he went "[t]hrough the 12th grade."

[2] Michelle Loudermilk is the decedent's wife. Although the decedent's name was spelled "Laudermilk" in this Court's opinion on direct appeal, the decedent's wife signed her statement as "Loudermilk." Therefore, we will use the "Loudermilk" spelling in this opinion.

involved in October of 1990. They continued to see each other after Mr. Loudermilk was killed.

The petitioner testified that, on the day of the shooting, Mr. Loudermilk confronted him about his affair with Mrs. Loudermilk. Afterwards, the petitioner went to a friend's home, and they phoned Mrs. Loudermilk. Mrs. Loudermilk asked the petitioner to meet her at the cemetery at 6:00 p.m. that evening. Mrs. Loudermilk arrived at the cemetery shortly after the petitioner arrived. They spoke in his car for approximately five (5) minutes until they observed the victim driving into the cemetery. The decedent exited his vehicle and threw a can of beer at the petitioner's windshield. Mrs. Loudermilk jumped out of the petitioner's vehicle and began running towards her car. The petitioner attempted to get out of his car, but Mr. Loudermilk kicked the door shut. Mr. Loudermilk threatened the petitioner, and as he turned to walk to his vehicle, the petitioner shot him. Because the petitioner could not see the victim, he walked around to the front of his vehicle and found Mr. Loudermilk on his hands and knees. Suddenly, Mrs. Loudermilk grabbed the shotgun from the petitioner's hands and shot the victim the second time.

The petitioner testified that his attorney never asked him whether Mrs. Loudermilk or any other witnesses were present at the scene of the shooting. However, he acknowledged that he lied to his attorney and also lied in his testimony at trial regarding Mrs. Loudermilk's involvement in the shooting. He stated that lied to protect Mrs. Loudermilk because she had informed him that she was pregnant with his child. Mrs. Loudermilk threatened to abort the child if the petitioner implicated her in her husband's death.

The petitioner also presented the signed statement of Michelle Loudermilk. This statement was the second statement given by Mrs. Loudermilk to TBI

-4-

officers on December 25, the day following her husband's death. In Mrs. Loudermilk's first statement to the law enforcement authorities, she claimed that she knew nothing about her husband's shooting. In her second statement, Mrs. Loudermilk admitted that she was present in the cemetery during Petitioner's confrontation with the decedent. She stated that she went to the cemetery to "put a tree" on her relatives' graves. When she arrived, the petitioner was there. She and the petitioner spoke for a while until they saw Mr. Loudermilk's vehicle driving into the cemetery. The victim exited his vehicle while holding a shotgun. She stated that she then returned to her car and left the cemetery. As she was driving away, she heard a gunshot.

With the exception of Mrs. Loudermilk's presence at the scene, the petitioner disputed the veracity of Mrs. Loudermilk's statement.

The petitioner testified that after he was convicted of murder and while his case was pending on appeal, Assistant District Attorney Joe Rehyansky, the Polk County Sheriff and a deputy sheriff met with him in prison. He stated that the state representatives explained to him that they believed he was lying to protect Mrs. Loudermilk. He testified that they advised him that if he would testify against Mrs. Loudermilk regarding her involvement in the shooting, he would be a free man. The petitioner testified that he refused to talk to the authorities because his attorney advised him not to speak to anyone.

Petitioner was represented by Conrad Finnell at trial. At the time of the hearing, Finnell had practiced law for 36 years, and a substantial portion of his practice was criminal. Finnell testified that, after hearing the petitioner's version of the facts of the case, he believed that the shooting was in self-defense. Petitioner never mentioned to Finnell that Mrs. Loudermilk was present at the cemetery at the time of the shooting. However, Finnell acknowledged that he

was unaware of Mrs. Loudermilk's second statement to TBI officers wherein she admitted being present during the incident. Finnell explained that, due to his heavy case load at the time, he was unable to personally review the discovery in this case. Instead, he relied upon members of his staff to review the materials. A member of his staff erroneously informed him that Mrs. Loudermilk was not present during the incident, and as a result, Finnell did not pursue the matter further. Apparently, the statement had been received from the state in discovery and misplaced in a "miscellaneous" sub-file.

Finnell testified that, while the petitioner's case was pending on appeal, an assistant district attorney and the Polk County Sheriff at the time conducted an uncounseled interview with the petitioner in prison. He did not recall giving the state authorities permission to speak with his client alone and learned about the interview after it occurred. Moreover, he could not recall whether anyone from the District Attorney's office attempted to contact him prior to the interview. However, because the petitioner's statement to the state agents was in conformity with his testimony at trial, Finnell did not believe that the petitioner was harmed by the meeting.

Assistant District Attorney Joe Rehyansky testified at the post-conviction hearing. He stated that he was assigned to work on the state's case against Michelle Loudermilk. In the course of his investigations, Rehyansky, accompanied by the sheriff of Polk County and his chief deputy, visited the petitioner while he was incarcerated in the penitentiary in November 1991.[3] Rehyansky wished to speak with the petitioner because he believed that the petitioner had not been forthright with regard to Mrs. Loudermilk's involvement

---

[3] The meeting took place approximately four (4) months after the petitioner was convicted of first degree murder.

in the shooting and wanted the petitioner to testify against Mrs. Loudermilk at her trial. He testified that although he attempted to contact Finnell prior to his meeting with the petitioner, he was unable to reach him. Rehyansky stated that the petitioner agreed to speak with them, but the petitioner gave the same version of the story as he testified to at trial. Rehyansky went on to state:

> But what I think I presented to him was this - and I made no promises. I said, "Maybe we can do this, Greg, if, if you're willing to tell the truth at Michelle's trial. Maybe we can get the judge to let the parties set aside your premeditated murder conviction and have you re-enter a plea to second degree." . . . And I think I may have told him to discuss that with Conrad. But he didn't have anything helpful to say at the time, and I never heard back from him or Conrad.

However, although he believed that Mrs. Loudermilk was equally culpable for her husband's murder, Rehyansky testified that, in his opinion, the petitioner was guilty of premeditated murder. Mrs. Loudermilk subsequently pled guilty to accessory after the fact to first degree murder.[4]

At the conclusion of the proof, the trial court denied post-conviction relief. In its written order denying post-conviction relief, the trial court noted that the petitioner deliberately and repeatedly misled his attorney into believing that he was the only person present during the shooting. The trial court further found that the petitioner "not only gave false statements to the investigating officers in this cause but . . . also knowing[ly] and willfully testified falsely during his testimony at trial." Additionally, the trial court observed that while the petitioner claimed that his attorney was deficient for failing to read Mrs. Loudermilk's second statement, the petitioner's testimony at the post-conviction hearing indicated "that every material issue in Michelle Loudermilk's statement was not true." The trial court concluded that trial counsel was not deficient for failing to

---

[4] Mrs. Loudermilk was charged with conspiracy to commit first degree murder, premeditated first degree murder and accessory after the fact. However, due to the state's lack of evidence, she was allowed to plead guilty to accessory after the fact.

read the "second false statement," and the petitioner was not prejudiced as a result of any alleged deficiency.

From the trial court's ruling, the petitioner brings this appeal.


## II.

### A. Standard of Review

In post-conviction proceedings, the petitioner bears the burden of proving the allegations raised in the petition by a preponderance of the evidence.[5] Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996); Wade v. State, 914 S.W.2d 97, 101 (Tenn. Crim. App. 1995). Moreover, the trial court's findings of fact are conclusive on appeal unless the evidence preponderates against the judgment. Tidwell v. State, 922 S.W.2d at 500; Campbell v. State, 904 S.W.2d 594, 595-96 (Tenn. 1995); Cooper v. State, 849 S.W.2d 744, 746 (Tenn. 1993).

### B. Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution provides, in part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." Similarly, Article I, § 9 of the Tennessee Constitution guarantees an accused "the right to be heard by himself and his counsel . . ." Additionally, Tenn. Code Ann. § 40-14-102 provides, "[e]very person accused of any crime or misdemeanor whatsoever is entitled to counsel in all matters necessary for such person's defense, as well to facts as to law."

The United States Supreme Court articulated a two-prong test for courts to employ in evaluating claims of ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Court

---

[5] Under the 1995 Post-Conviction Procedure Act, the petitioner has the burden of proving his claims by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f). However, since the present petition was filed in 1994, the petitioner's claims must be proven by a preponderance of the evidence.

began its analysis by noting that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686, 104 S.Ct. at 2064. When challenging the effective assistance of counsel in a post-conviction proceeding, the petitioner bears the burden of establishing (1) the attorney's representation was deficient; and (2) the deficient performance resulted in prejudice so as to deprive the defendant of a fair trial. Strickland, 466 U.S. at 687, 104 S.Ct. at 2064; Powers v. State, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). This Court is not required to consider the two prongs of Strickland in any particular order. Harris v. State, 947 S.W.2d 156, 163 (Tenn. Crim. App. 1996). "Moreover, if the Appellant fails to establish one prong, a reviewing court need not consider the other." Id.

The test in Tennessee in determining whether counsel provided effective assistance at trial is whether counsel's performance was "within the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975); *see also* Harris v. State, 947 S.W.2d at 163. In order to demonstrate that counsel was deficient, the petitioner must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 688, 104 S.Ct. at 2064; Harris v. State, 947 S.W.2d at 163.

Under the prejudice prong of Strickland, the petitioner must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.

In reviewing counsel's conduct, a "fair assessment . . . requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S.Ct. at 2065. The mere failure of a particular tactic or strategy does not *per se* establish unreasonable representation. Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996). However, this Court will defer to counsel's tactical and strategic choices only where those choices are informed ones predicated upon adequate preparation. Id.; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

### C. Statement of Michelle Loudermilk

In his first allegation of ineffective assistance of counsel, the petitioner claims that trial counsel was ineffective for failing to read and "properly utilize" the second statement of Michelle Loudermilk. The petitioner contends that trial counsel, by failing to read the statement, was unable to prepare an effective defense as he did not have the benefit of the statement while questioning or advising his client. He asserts that Mrs. Loudermilk was a devious woman who manipulated the petitioner, and had trial counsel utilized this statement properly, he could have argued to the jury that Mrs. Loudermilk lured both the petitioner and Mr. Loudermilk to the cemetery in hopes of a fatal confrontation. He further argues that trial counsel could have called Mrs. Loudermilk to testify at trial as a corroborating witness that the victim was the first aggressor in the shooting.

We agree that it is certainly the better practice for trial counsel to personally review all materials received in discovery. However, in light of the fact that the petitioner deliberately deceived his attorney in this regard, we hesitate to find trial counsel's performance defective. We do not believe that trial counsel should be saddled with the burden of forcing his client to be truthful when that

client has willfully and repetitively lied to the attorney at every stage of the proceedings. Clearly, the petitioner held his fate in his own hands and should not be rewarded for choosing the path of deceit.

Regardless of whether trial counsel was deficient in failing to read Mrs. Loudermilk's second statement to the TBI officers, the petitioner has not demonstrated how he was prejudiced by this alleged deficiency. First, there is no evidence in the record to suggest that the petitioner would have implicated Mrs. Loudermilk in the shooting had he been confronted with the statement by his attorney. The petitioner testified that, as a result of her threat to abort their child if implicated in her husband's shooting he lied to his attorney and in his trial testimony regarding Mrs. Loudermilk's involvement. However, the child was born on February 1, 1992, approximately seven (7) months after the petitioner's trial.[6] The petitioner gives no indication as to how Mrs. Loudermilk's threat of abortion would have been lifted had trial counsel read and confronted the petitioner with the statement. Finnell testified that had he confronted the petitioner with the statement and the petitioner denied Loudermilk's presence at the scene, he "would have gone ahead and proceeded with this case just like [he] did." In addition, there is no evidence in the record to suggest that Mrs. Loudermilk would have testified favorably for the petitioner had trial counsel attempted to call her as a witness.

Furthermore, as noted by the trial court, even though the petitioner refers to Mrs. Loudermilk's statement as "exculpatory" in nature, he disputes almost every material aspect of the statement. Specifically, Mrs. Loudermilk stated that her husband exited his vehicle with a shotgun in his hands, whereas the

---

[6] The petitioner testified that Mrs. Loudermilk first informed him of the pregnancy approximately two (2) weeks prior to the shooting. However, the baby was born almost fourteen (14) months later.

petitioner stated that Mr. Loudermilk was not armed while exiting the vehicle. Secondly, Mrs. Loudermilk stated that the petitioner told her that he would kill her husband if Mr. Loudermilk was abusive to her. The petitioner flatly denied ever making such a statement. Additionally, the petitioner testified that Mrs. Loudermilk was seated inside his car when the victim drove into the cemetery, but Mrs. Loudermilk claimed that she was standing outside of the car. Finally, and perhaps most importantly, Mrs. Loudermilk stated that she heard a shot as she was leaving the cemetery. The petitioner testified that Mrs. Loudermilk was not only present during the shooting, but actually fired the second shot.

The petitioner gave two statements to TBI officials on the day following the shooting. In one statement, he denied any involvement in the shooting. In the second, he claimed that he shot the victim twice in self-defense. Petitioner's testimony at the post-conviction hearing clearly conflicts both statements given to the TBI agents. If the petitioner had testified at trial that Mrs. Loudermilk also fired the shotgun, the jury would have been faced with three (3) conflicting versions of the facts from the petitioner. There is little doubt that the petitioner's credibility would have been seriously questioned.

Moreover, the state presented evidence at trial that the petitioner premeditated the shooting of Mr. Loudermilk. There was testimony at trial that the victim did not have any weapons in his vehicle approximately thirty minutes prior to the shooting. However, law enforcement authorities found a shotgun in the floorboard of the victim's truck and a .22 caliber revolver in the glove compartment. The revolver was identified as previously belonging to the petitioner, and a .22 automatic weapon found on the victim's person was identified as belonging to Mrs. Loudermilk. Although the petitioner testified that Mr. Loudermilk threw a beer can at his windshield, no beer can was found in the

cemetery by investigators. Significantly, TBI Agent Brooks Wilkins testified that, after an examination of tire tracks found at the cemetery, the law enforcement authorities concluded that Michelle Loudermilk's vehicle was present at the cemetery on the night of December 24.

The state's evidence presented at trial, coupled with the petitioner's proposed testimony that both he and Mrs. Loudermilk shot the victim, could suggest that the petitioner and Mrs. Loudermilk conspired to kill the victim. Although the petitioner insists that Mrs. Loudermilk's statement is evidence that she is an older,[7] devious, manipulative woman who lured the petitioner and Mr. Loudermilk to the cemetery in hopes of a fatal confrontation, it is equally plausible that the jury would have believed the state's theory that the petitioner and Mrs. Loudermilk lured the victim to the cemetery and laid in wait for him to arrive. Indeed, trial counsel recognized this possibility, as he testified, "the implications of her being there are obvious under these circumstances."

From a thorough review of the record, we conclude that the petitioner has not shown a "reasonable probability that . . . the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. at 694, 104 S.Ct. at 2068. Therefore, we agree with the trial court that the petitioner has not demonstrated that he was prejudiced by his attorney's alleged deficiency.

This issue is without merit.

### D.  Uncounseled Interview

In his second allegation of ineffective assistance of counsel, the petitioner claims that trial counsel was deficient in allowing the state authorities to interview

---

[7] Petitioner claims that Mrs. Loudermilk informed him that she was in her thirties at the time of the incident. However, it appears from the record that Mrs. Loudermilk is merely two (2) years older than the petitioner. The petitioner admitted that he and Mrs. Loudermilk attended the same high school for a period of time.

his client outside of his presence. Petitioner maintains that he was deprived of effective representation when trial counsel failed to return the assistant district attorney's phone calls. He argues that had trial counsel been present at the meeting, he could have convinced the petitioner to testify at Mrs. Loudermilk's trial in exchange for a reduced plea to second degree murder.

Trial counsel Conrad Finnell could not recall the details regarding the assistant district attorney's uncounseled visit with the petitioner while he was in prison. However, Assistant District Attorney Joe Rehyansky testified that he left several messages with Finnell prior to the meeting. After the meeting proved unsuccessful, Rehyansky spoke with Finnell in an informal setting, and Finnell did not appear to be troubled by the meeting with his client. Rehyansky further recalled that Finnell was especially optimistic that the petitioner's conviction would be overturned on appeal.

We do not find that trial counsel provided deficient performance in failing to return the assistant district attorney's phone calls. Trial counsel was optimistic that his client's conviction would be overturned on appeal. Likewise, counsel believed that the petitioner shot the victim in self-defense and was unaware that Mrs. Loudermilk was present at the cemetery during the shooting. Therefore, he had no reason to believe that an interview with the law enforcement authorities would have been fruitful.

In any event, the petitioner has failed to demonstrate prejudice. First, from his own testimony it appears that the petitioner was still under the influence of Mrs. Loudermilk at the time the interview took place in November 1991. The

baby she threatened to abort was not born until February of 1992. Additionally, according to the petitioner's mother, Mrs. Loudermilk continued to visit the petitioner in prison until she pled guilty in December 1991. As a result, there is no evidence that trial counsel could have convinced the petitioner to testify "truthfully" against Mrs. Loudermilk at her trial.

Furthermore, there is no evidence that the state would have agreed to set aside the petitioner's conviction of first degree murder and allow him to plead guilty to second degree murder. Assistant District Attorney Rehyansky stressed that he made no promises to the petitioner, but merely stated, "[m]aybe we can get the judge to let the parties set aside your premeditated murder conviction and have you re-enter a plea to second degree." (Emphasis added). Nor is there any evidence that the trial court would have approved of such an arrangement.

The petitioner has not demonstrated that trial counsel's performance was deficient or how he was prejudiced by this alleged deficiency. This issue has no merit.

### III.

The petitioner in this case has repeatedly and willfully lied to his trial attorney, not to mention law enforcement authorities and in his testimony at trial. Under these circumstances, we cannot conclude that trial counsel's performance was deficient. Moreover, the petitioner has not demonstrated how he was

prejudiced by the alleged deficient performance of trial counsel.  Accordingly, the judgment of the trial court denying post-conviction relief is affirmed.

_____
JERRY L. SMITH, JUDGE

CONCUR:


_____
DAVID G. HAYES, JUDGE


_____
JAMES CURWOOD WITT, JR., JUDGE